1   John L. Smaha, Esq. Bar No. 95855
     John Paul Teague, Esq. Bar No. 254249
2   SMAHA LAW GROUP, APC
     7860 Mission Center Court, Suite 100
3   San Diego, California 92108
     Telephone:    (619) 688-1557
4   Facsimile:     (619) 688-1558

5   Attorneys for Defendants, Willmark Communities, Inc.
     and Alpine Creekside, Inc.

6

7

8                   **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  GEORGE LEASURE AND AMY      )   Case No.  11-CV-0443-L (DHB)
     LEASURE;                     )
12                         )   **MEMORANDUM OF POINTS AND**
               Plaintiffs,  )   **AUTHORITIES IN SUPPORT OF**
13                         )   **DEFENDANTS' MOTION FOR**
            vs.               )   **SUMMARY JUDGMENT OR IN THE**
14                         )   **ALTERNATIVE SUMMARY**
     WILLMARK COMMUNITIES, INC. a  )   **ADJUDICATION OF CLAIMS**
15   Corporation; and ALPINE CREEKSIDE, )
     INC., a Corporation;          )   Date:   July 23, 2012
16                         )   Time:  10:30 a.m.
              Defendant.  )   Courtroom: 14 - Fifth Floor
17                         )
                         )   Judge: Hon. James M. Lorenz
18                         )   Complaint Filed: March 3, 2011
                         )
19  _____)

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   SUMMARY OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  AUTHORITY FOR MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . 5

IV.   PURPOSE AND CONSTRUCTION OF THE FEDERAL
      FAIR DEBT COLLECTION PRACTICES ACT: DEFINITION OF
      "DEBT COLLECTOR" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.   Neither Defendant has a Principal Purpose of Debt
           Collection or "Regularly Collects" any Debt of a Third
           Party and is therefore Not a Debt Collector  . . . . . . . . . . . . . . . . . . . . . . . 9

      B.   Defendants Attempted to Collect a Debt They Originated
           under 15 U.S.C. § 1692a(6)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.   Willmark Communities is Entitled to Use the
           "Creekside Meadows" Business Name  . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.   Willmark Communities Fits within the Exception under
           15 U.S.C. 1692a(6)(B) because at all times Acted for
           Another Entity, both of which were related by Common
           Ownership or Affiliated by Corporate Control  . . . . . . . . . . . . . . . . . . . . 14

V.    THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL
      FACT IN RELATION TO PLAINTIFFS' SECOND CLAIM
      FOR RELIEF UNDER THE R-FDCPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI.   DEFENDANTS DID NOT SEEK TO COLLECT
      ANY DEBTS OWED BY GEORGE LEASURE . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII.  THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL
      FACT IN RELATION TO PLAINTIFFS' THIRD CLAIM FOR
      RELIEF FOR FRAUD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.   Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.   Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.   Knowledge of Falsity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.   Intent to Induce Reliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      E.   Justifiable Reliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      F.   Causation and Damage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII. THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL
      FACT IN RELATION TO PLAINTIFFS' FOURTH CLAIM FOR
      RELIEF FOR BAD-FAITH RETENTION OF SECURITY DEPOSIT . . . . . . . . . . . . . 20

TABLE OF CONTENTS/TABLE OF AUTHORITIES

i

A.   Requirements under Civil Code § 1950.5 for Retention of a Security Deposit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.   Defendants were Entitled to Apply the Security Deposit . . . . . . . . . . . . . . . . . 23

IX.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## **TABLE OF AUTHORITIES**

*Alexander v. Omega Management, Inc.*
(D. Minn. 1999) 67 F.Supp.2d 1052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Argentieri v. Fisher Landscapes, Inc.*
(D. Mass. 1998) 27 F. Supp. 2d 84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Aubert v. American General Finance, Inc.*
(7th Cir. 1998) 137 F.3d 976 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Beck v. Alliance Funding Co.*
(D. Conn. 2000) 113 F.Supp.2d 274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Berndt v. Fairfield Resorts, Inc.*
(W.D. Wis. 2004) 339 F. Supp. 2d 1064 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Celotex Corp v. Catrett*
(1986) 477 U.S. 318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*De Dios v. International Realty & Investments*
(9th Cir. 2011) 641 F.3d 1071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Dickenson v. Townside T.V. & Appliance, Inc.*
(S.D. W.Va. 1990) 770 F.Supp. 1122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Downs v. Clayton Homes, Inc.*
(6th Cir. 2004) 88 Fed.Appx. 851 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*First Nat'l Bank v. Cities Service Co.*
(1968) 391 U.S. 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*First Services Group, Inc.v. O'Connell (In re Ceron)*
(Bankr. E.D. N.Y. 2009) 412 B.R. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fox v. Citicorp Credit Servs.*
Inc. (9th Cir. 1994) 15 F.3d 1507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Francheschi v. Mautner-Glick Corp.*
(S.D. N.Y. 1998) 22 F.Supp.2d 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Friedman v. Rubinstein*
(N.D. Ill. 1997) 1997 WL 757875 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

*Havens Tobias v. Eagle*
(S.D. OH 2001) 127 F.Supp.2d 889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Heintz v. Jenkins*
(1995) 514 U.S. 291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Independenc Cellulor Telephone, inc. v. Daniels & Associates*
(N.D. Cal. 1994) 863 F. Supp. 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Jarzyna v. Home Properties, L.P.*
(E.D.Pa.2011) 763 F.Supp.2d 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kegley v. Miles Management Corporation*
(N.D. Ill. 1992) 1992 WL 370251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Magee v. AllianceOne, Ltd.*
(S.D. Ind. 2007) 487 F.Supp.2d 1024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Marcotte v. General Electric Capital Services, Inc.*
(S.D. Cal. 2010) 709 F.Supp.2d 994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Masuda v. Thomas Richards & Co.*
(C.D. Cal. 1991) 759 F.Supp. 1456 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pavone v. Citicorp Credit Services, Inc.*
(S.D.Cal.1997) 60 F.Supp.2d 1040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Reynolds v. Gables Residential Services, Inc.*
428 F.Supp.2d at 1264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Romine v. Diversified Collection Servs., Inc.*
(9th Cir.1998) 155 F.3d 1142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Schmitt v. FMA Alliance*
(8th Cir. 2005) 398 F.3d 995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stafford v. Cross*
(W.D. Ky. 2003) 262 F.Supp.2d 776 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Taylor v. Rollins, Inc.*
(N.D. Ill. 1998) 1998 WL 164890 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United Sattes v.1 Parcel Real Property*
(9th Cir. 1990) 904 F. 2d 487 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Von Schmidt v. Kratter*
(D. Conn. 1997) 9 F. Supp. 2d 100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*///*

*///*

*///*

---

TABLE OF CONTENTS/TABLE OF AUTHORITIES

**CALIFORNIA CASES**

*Bezaire v. Fidelity and Deposit Co.*
(1970) 12 Cal. App. 3d 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cicone v. URS Corp.*
(1986) 183 Cal.App.3d 194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Conrad v. Bank of America*
(1996)45 Cal. App. 4th 133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Block v. Tobin*
(1975) 45 Cal.App.3d 214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doctor v. Lakeridge Constr. Co.*
(1967) 252 Cal. App. 2d 715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Engalla v. Permanente Medical Group, Inc.*
(1997) 15 Cal.4th 951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fittante v. Palm Springs Motors, Inc.*
(2003) 105 Cal. App. 4th 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*GN Mortgage Corp. v. Fidelity Nat'l Title Ins. Co.*
(1994) 21 Cal. App.4th 1802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Granberry v. Islay Inv.*
(1995) 9 Cal.4th 738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Handley v. Handley*
(1960) 179 Cal.App.2d 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Nagy v. Nagy*
(1989) 210 Cal. App. 3d 1262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Roddenberry v. Roddenberry*
(1996) 44 Cal.App.4th 634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Seeger v. Odell*
(1941) 18 Cal.2d 409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United Multiple Listing Service, Inc. v. Bernstein*
(1982) 134 Cal. App. 3d 486 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wildey v. Seaver*
(1931) 111 Cal.App. 565 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

///

///

///

///

---

TABLE OF CONTENTS/TABLE OF AUTHORITIES

iv

## FEDERAL RULES OF CIVIL PROCEDURE
Rule 56(c) .................................................................. 5

## UNITED STATES CODE
15 Section 1692 ............................................................. 2
15 Section 1692(a) ......................................................... 7
15 Section 1692a ................................................... 8, 10, 15
15 Section 1692a(3) ........................................................ 6
15 Section 1692a(4) ........................................................ 6
15 Section 1692a(5) ........................................................ 6
15 Section 1692a(6) ........................................................ 6
15 Section 1692a(6)(A)-(F) ......................................... 7, 14, 15
15 Section 1692a(6)(B) ......................................... 9, 11, 12, 13, 14
15 Section 1692(6) ......................................................... 8
15 Section 1692c ....................................................... 6, 16
15 Section 1692c(d) ........................................................ 6
15 Section 1692(e) ......................................................... 7
15 Section 1692a(6)(F) .................................................... 11
15 Section 1692a(6)(F)(ii) ......................................... 8, 10, 13
15 Section 1692(6)(F)(iii) ........................................ 8, 10, 15
15 Section 1692a-1692o ............................................ 8, 10, 15
15 Section 1692f .......................................................... 15
15 Section 1692f(7) ....................................................... 16
15 Section 1692k ........................................................... 6
15 Section 1692(8) ....................................................... 16
15 Section 1692e(11) ............................................... 6, 15, 16
15 Sections 1692b thru 1692j ............................................ 15
15 Section 1692(g) ....................................................... 15
28 Section 1367(c)(3) .................................................... 15

## CALIFORNIA CODE OF CIVIL PROCEDURE
Section 12 ............................................................... 23
Section 12a .............................................................. 23
Section 12b .............................................................. 23
Section 1709 ............................................................. 17
Section 1710 ............................................................. 19
Section 1788.13(a) .................................................... 2, 11
Section 1788.14(c) .................................................... 5, 16
Section 1788.17 .......................................................... 15
Section 17101 ............................................................ 18
Section 1950.5 ....................................................... 20, 22
Section 1950.5(b) .................................................... 21, 22
Section 1950.5(e) ........................................................ 22
Section 1950.5(f) ........................................................ 22
Section 1950.5(g) ........................................................ 23
Section 12 ............................................................... 23
Section 12a .............................................................. 23
Section 12b .............................................................. 23

## CALIFORNIA BUSINESS AND PROFESSIONS CODE
Section 17900 ............................................................. 2

1   Defendants, Willmark Communities, Inc. and Alpine Creekside, Inc. (collectively,

2   "Defendants"), for themselves alone, herein submit this Memorandum of Points and Authorities in

3   Support of their Motion for Summary Adjudication against each claim for relief in the Complaint

4   filed by George Leasure and Amy Leasure (collectively, "Plaintiffs").

5   ## I.

6   ## PRELIMINARY STATEMENT

7   **This motion for summary judgment is being made simple because Defendants are not**

8   **debt collectors under federal law.** Thus, this case does not present the circumstances that Congress

9   had in mind when it enacted the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*

10  ("FDCPA"). Nor is the express purpose of California's analogous Rosenthal Fair Debt Collection

11  Practices Action, Civil Code § 1788, *et seq.* ("R-FDCPA"), served by this action.  Fundamentally,

12  there existed a valid debt and there was never any confusion as to the identities of the parties, or that

13  the debt was being collected by the entity that owned it.  No third party debt collector was involved

14  and no reasonable post-facto analysis of the facts can yield anything other than a landlord reasonably

15  collecting its debts, responding promptly to customer concerns, and otherwise acting appropriately.

16  Plaintiffs' argument, as pled, focuses on the use of the fictitious business name utilized by

17  Alpine Creeksides, Inc. ("Alpine Creekside") pursuant to California Business and Professions Code

18  § 17900. "Creekside Meadows" is the name of the complex where the Plaintiffs resided, and is on

19  the lease itself.  It is also the party to whom Plaintiffs' issued their rent checks, and is listed on all

20  correspondence with tenants as a matter of course.  Both Alpine Creekside and its management agent

21  were identified in the lease as such as well.  Plaintiffs, however, will attempt to put Defendants'

22  business methods on trial, rather than focus on the underlying debt and/or purported damages. They

23  will argue that Willmark Communities, Inc. ("Willmark Communities"), in acting as an agent in its

24  capacity as manager of the apartment complex in which Plaintiffs lived, and should not have used

25  this appellation in its correspondence with tenants.  Such arguments are baseless posturing on top

26  of strained logic.  Moreover, it should be noted that California's statute specifically allows the use

27  of the creditor's name in collection activities. (Cal. Civ. Code § 1788.13(a).)  Accordingly, there

28

1    is no basis in law or fact for the implication of either statute in this action.

2          Alpine Creekside, doing business as "Creekside Meadows," was holding its own debt

3    resulting from a residential lease agreement. Willmark Communities, a sister corporation, affiliated

4    with Creekside Meadows through common ownership and corporate control of a single individual,

5    acts as an agent for Creekside Meadows for all management purposes. Neither the FDCPA, nor the

6    analogous California statute, apply and summary judgment should be granted.

7    **II.**

8    **SUMMARY OF FACTS**

9          The facts on which this motion is based are not subject to dispute:

10         1.    Willmark Communities is the brand name for a family of apartment complexes

11   managed and maintained by defendant Willmark Communities. These communities are located

12   primarily in San Diego, California. Both the corporations holding title to the individual properties,

13   and Willmark Communities itself, are owned and operated by a single individual, Mark Schmidt.

14   (See Declaration of Mark Schmidt ("Schmidt Decl.") at ¶ 2.) Creekside Meadows, the apartment

15   complex where George and Amy Leasure resided, has its leasing office at 1750 Arnold Way, Alpine,

16   CA 91901. Alpine Creekside, doing business as Creekside Meadows, holds title to the property, and

17   maintains a Fictitious Business Name for "Creekside Meadows" on file with the San Diego County

18   Recorder. (*Id.*; see also Declaration of John Paul Teague ("Teague Decl.") at Exhibit "A.")

19         2.    The Residential Lease Agreement utilized by Willmark Communities identifies the

20   owner of the property as Alpine Creekside, and that Willmark Communities acts as the owner's

21   agent. (See Declaration of Cindy Peel ("Peel Decl.") at Exhibit "B.") This information is provided

22   to tenants so that they are aware of the actual entities who own and manage the property. However,

23   for ease of reference, tenants do not interact with their landlord via its full corporate title except via

24   the name of the community where they reside. For instance, the Leasures wrote their rent checks

25   to "Creekside Meadows" and all correspondence with the Leasures utilized that name. (Schmidt

26   Decl. at ¶ 3; Peel Decl. at ¶ 4.) Once again, this avoids confusion and provides clarity and

27   consistency for the tenants in their dealings with their landlord. (Schmidt Decl. at ¶ 3.)

28

3.     Plaintiffs moved into their apartment at 1750 Arnold Way, Unit 14, Alpine CA 91901-3858, located in Building 17 of Creekside Meadows, on or about September 18, 2009. (Declaration of Rita Ruiz ("Ruiz Decl.") at ¶ 2.) The complete written Residential Lease Agreement (the "Lease") was executed on September 12, 2009, with a term of 16 months and 13 days, or from September 18, 2009 through January 31, 2011. (See Peel Decl. at Exh. B; see also Declaration of Kaitlin Smith ("Smith Decl.") at ¶ 6.) Subsequent to their move in, the Plaintiffs complained about nosy neighbors and expressed their desire to move from an upstairs apartment to a downstairs apartment when one became available, and they were put on a waiting list among more than a dozen other elderly residents. (Smith Decl. at ¶ 5.) The Lease had a base rent of $980.00 per month, although a concession for on-time payments permitted rental payments of only $895.00, which the Leasures paid via checks issued to "Creekside Meadows." (See Peel Decl. at Exh. B.) A new computer program, however, unfortunately re-categorized the lease as an annual lease, rather than of the more irregular term of 16 months, and a premature renewal lease was therefore issued on August 31, 2010, incorrectly listing the Lease expiration as October 31, 2010. (Ruiz Decl. at ¶ 6.) Defendants recognize that the system error allowed for the premature lease renewal letter.

4.     The Leasures, despite their understanding of the actual Lease term, decided to vacate their apartment by the end of October 2010, relying on the renewal letter. (See Peel Decl. at Exhibit "F.") On or about October 30, 2010, the Leasures and a representative of Willmark Communities, Tony Mercado, conducted a final inspection and the keys were returned by the following day. (See Peel Decl. at Exhibits "C" and "D.") The initial final account statement that was subsequently issued on November 22, 2010 treated the move out as a breach of the Lease and included accelerated rent through January 2011 and late fees, for a total account balance of $4,917.05. (See Peel Decl. at Exhibit "G.") The initial "Final Accountant Statement" included a cover letter addressed to Amy Leasure. All account statement cover letters expressly provided that:

> This communication is for the purpose of a debt collection account **we own**. This is an attempt to collect a debt. Any information will be used for that purpose.

(*Id.* [Emphasis added])

1        5.      George Leasure called Defendants on or about December 7, 2010 and notified

2 Defendants of the error and the premature renewal letter. (Ruiz Decl. at ¶ 4.)  The account was

3 placed under review and the error fully acknowledged, a credit of $4,278.50 was issued to the

4 Leasures, and a revised account statement was sent out on December 7, 2010. (Ruiz Decl. at ¶¶ 5-

5 10; see also Peel Decl. at Exh. J.) On that same day, a communication from a Janet Sobel was made

6 to Defendants to complain about charges that had already been deducted from the account.  Ms.

7 Sobel was informed that the account had already been revised to address these concerns.  During this

8 telephone conversation, Ms. Sobel was rude, threatening and condescending to Defendants'

9 personnel and she demanded to speak with counsel for Defendants.   No demand that all

10 communications, including account statements be sent to counsel, was ever made by Ms. Sobel.

11 Indeed, Civil Code § 1788.14(c) allows for statements of account to be forwarded directly to

12 represented debtors and Ms. Sobel's follow-up written correspondence addressed issues that were

13 dealt with in the account review that responded to Mr. Leasure's previous telephone conversation

14 with staff prior to Ms. Sobel's involvement. (Ruiz Decl. at ¶ 7.)

15        6.      The debt was owed to the entity attempting to collect it, no third party debt

16 collector was involved, Defendants promptly responded to the concerns of the Leasures and, when

17 a system error was brought to their attention, the account was immediately brought under review

18 with a credit eventually issued amounting to 87% of the balance set forth in initial account statement.

19 (Ruiz Decl. at ¶¶ 2-10.)  All rental payments made under the Lease, although collected by Willmark

20 Communities, were directly deposited in Alpine Creekside's bank account as owner of the debt, with

21 Willmark Communities merely acting as a property manager.

**III.**

**AUTHORITY FOR MOTION FOR SUMMARY JUDGMENT**

24 A moving party is entitled to summary judgment under Federal Rule of Civil

25 Procedure 56(c): "if the pleadings, the discovery and disclosure materials on file, and any

26 affidavits show that there is no genuine issue as to any material fact and that the movant is

27 entitled to judgment as a matter of law.:" (See also *Celotex Corp v. Catrett* (1986) 477 U.S.

1   318, 322.) "A fact is 'material' if it might affect the outcome of the suit under the governing

2   law.) And an issue of fact in genuine 'if the evidence is such that a reasonable jury could

3   return a verdict for the nonmoving party.'" (*Id.*; see also *First Services Group, Inc.v.*

4   *O'Connell (In re Ceron)* (Bankr. E.D. N.Y. 2009) 412 B.R. 41, 46.)

5        "Because the defendant does not bear the burden of proof at trial, the defendant need

6   only point to the insufficiency of the plaintiff's evidence to shift the burden to the plaintiff to raise

7   genuine issues of fact as to each claim by substantial evidence." (*Independenc Cellular Telephone,*

8   *inc. v. Daniels & Associates* (N.D. Cal. 1994) 863 F. Supp. 1109, 1113.)  This requires the non

9   moving party to produce at least some "significant probative evidence tending to support the

10  complaint."  (First Nat'l Bank v. Cities Service Co. (1968) 391 U.S. 253, 290.)  A non-moving

11  party cannot rely on conclusory allegations unsupported by factual data to create an issue of material

12  fact. (*United Sattes v.1 Parcel Real Property.* (9th Cir. 1990) 904 F. 2d 487, 492 n.3.)

13                                          IV.

14  **PURPOSE AND CONSTRUCTION OF THE FEDERAL FAIR DEBT**

15  **COLLECTION PRACTICES ACT: DEFINITION OF "DEBT COLLECTOR"**

16        Before a defendant may be held liable for a violation of the FDCPA, the basic elements of

17  a cause of action under the Act must be proven.  To establish a prima facie case for violation of the

18  FDCPA plaintiff must plead and prove four elements:

19    (1)   the plaintiff is any natural person who is harmed by violations of the
            FDCPA, or is a "consumer" within the meaning of 15 U.S.C. §§
20          1692a(3), 1692c(d) for purposes of a cause of action pursuant to 15
            U.S.C. § 1692c or 15 U.S.C. § 1692e(11);
21    (2)   the "debt" arises out of a transaction entered primarily for personal,
            family, or household purposes; 15 U.S.C. § 1692a(5);
22    (3)   the defendant collecting the debt is a "debt collector" within the
            meaning of 15 U.S.C. § 1692a(6); and
23    (4)   the defendant has violated, by act or omission, a provision of the
            FDCPA, 15 U.S.C. § 1692a-1692o; 15 U.S.C. § 1692a; 15 U.S.C. §
24          1692k.

25        The FDCPA (15 U.S.C. §§ 1692-1692o), was enacted in 1977 and became effective in 1978

26  as Title VIII of the Consumer Credit Protection Act.  (Act May 29, 198, PL 90-321, Title VIII, as

27  added September 20, 1977, PL 95-109, 91 Stat 874.)  It was enacted to eliminate *abusive* debt

28

1   collection practices by *debt collectors*, to insure that those debt collectors who refrain from using

2   abusive debt collection practices are not competitively disadvantaged, and to promote consistent

3   state action to protect consumers against debt collection abuses.   (15 U.S.C. § 1692(e).)   It was

4   therefore designed to supplement existing laws and procedures for dealing with "the use of abusive,

5   deceptive, and unfair debt collection practices by many debt collectors." (15 U.S.C. § 1692(a).) The

6   FDCPA expressly regulates only "debt collectors."   The FDCPA does not regulate creditors'

7   activities at all. (See *Schmitt v. FMA Alliance* (8th Cir. 2005) 398 F.3d 995.)   The definitional

8   provision of the statute contains a definition of "debt collector" as well as language describing certain

9   categories of persons (which includes corporations or other entities) and entities excluded from the

10  definition.  (See 15 U.S.C. § 1692a(6)(A)-(F).)

11          In order to assert direct liability under the FDCPA, a plaintiff must therefore show that the

12  defendant's actions or status render it a "debt collector" for purposes of the Act.  (See *Heintz v.*

13  *Jenkins* (1995) 514 U.S. 291, 292; *Fox v. Citicorp Credit Servs., Inc.* (9th Cir. 1994) 15 F.3d 1507,

14  1513.)   Ordinarily, the FDCPA protects consumers against only those entities engaged in the

15  business of collecting debts for unrelated third parties. (See *Romine v. Diversified Collection Servs.,*

16  *Inc.* (9th Cir.1998) 155 F.3d 1142, 1146.)   An alleged debt collector may fall out of that

17  categorization either by failing to qualify as a "debt collector" under the initial definitional language,

18  or by falling within one of the exemptions.

19          The relevant portions of FDCPA provide as follows:

20              § 1692a. Definitions
                As used in this subchapter—
21              (1)–(3) [Omitted]
                (4)      The term "creditor" means any person who offers or extends credit
22                       creating a debt or to whom a debt is owed, but such term does not
                         include any person to the extent that he receives an assignment or
23                       transfer of a debt **in default** solely for the purpose of facilitating
                         collection of such debt for another.
24              (5)      [Omitted]
                (6)      **The term "debt collector" means any person who uses any**
25                       **instrumentality of interstate commerce or the mails in any**
                         **business the principal purpose of which is the collection of any**
26                       **debts, or who regularly collects or attempts to collect, directly**
                         **or indirectly, debts owed or due or asserted to be owed or due**
27                       **another.** Notwithstanding the exclusion provided by clause (F) of
                         the last sentence of this paragraph, the term includes any creditor
28

who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—

(A)   any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B)   **any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;**

. . .

(F)   any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) **concerns a debt which was originated by such person;** (iii) concerns a debt which was not in default at the time it was obtained by such person; . . .

(Emphasis added.)

Although the statute does not expressly distinguish between a "debt collector" and a creditor collecting its own debts, the statute does specifically exclude from the definition of "debt collector" a person collecting or attempting to collect a "debt which was originated by such person" or for which it was authorized to collect prior to default. (15 U.S.C. § 1692a(6)(F)(ii) and (iii).) In addition, a distinction between debt collectors and creditors is clearly implied by: (1) the statute's separate definition of "creditor"; (2) the statute's express exemption in favor of "any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control"; and (3) the part of the definition of "debt collector" which requires that the debt in question be "owed or due another." (See 15 U.S.C. §§ 1692a(4) and (6).) Thus, courts have often found that a many alleged "debt collectors" will not qualify as such because in actuality they are creditors collecting their own debts. Even those courts that have determined under the facts that a particular person or entity was a debt collector have acknowledged that these categories as used in the statute are intended to be mutually exclusive.

A person engaging in some debt collection activity is not sufficient to render the person a

1  "debt collector" under the terms of the statute. Debt collection must be "the principal purpose" of

2  the person's business. While no bright–line distinction has appeared, the decisions finding that the

3  volume or regularity of debt collection activity engaged in by particular persons was sufficient or

4  insufficient under particular facts show that the courts have been concerned with numbers, that is,

5  the proportion of an alleged debt collector's business that is represented by debt collection activities,

6  which have been measured by overall matters, employees, revenue or expenses. (See *Pavone v.*

7  *Citicorp Credit Services, Inc.* (S.D.Cal.1997) 60 F.Supp.2d 1040, affirmed 172 F.3d 876.)

8      With respect to affiliates of creditors, the statute excludes from the definition of "debt

9  collector" "any person while acting as a debt collector for another person, both of whom are related

10  by common ownership or affiliated by corporate control, if the person acting as a debt collector does

11  so only for persons to whom it is so related or affiliated and if the principal business of such person

12  is not the collection of debts." (15 U.S.C. § 1692a(6)(B).) The courts have generally interpreted the

13  term "such person" as referring to the person or entity doing the collecting, and have accordingly

14  held corporate affiliates to be debt collectors when debt collection was their principal business but

15  not otherwise. (See *Beck v. Alliance Funding Co.* (D. Conn. 2000) 113 F.Supp.2d 274.)

16  **A.    Neither Defendant has a Principal Purpose of Debt Collection or "Regularly Collects"**

17  **any Debt of a Third Party and is therefore Not a Debt Collector**

18      A debt collector must "regularly" collect, or attempt to collect, consumer debts owed to

19  others. Although there is limited  case law construing the term "regular," if no single factor

20  predominates, courts should look to the overall circumstances on a case–by–case basis to make this

21  determination; it would not be within the purposes of the Act for activity undertaken pursuant to the

22  directions of a client or in the interests of a client to constitute debt collection from that client subject

23  to the restrictions of the FDCPA. (*Von Schmidt v. Kratter* (D. Conn. 1997) 9 F. Supp. 2d 100.)

24  Property management companies, even when not related to the landlord and/or creditor, will

25  generally not be "debt collectors" within the meaning of the FDCPA where they perform a number

26  of services unrelated to collecting debts and the total operations devoted to debt collection is not

27  significant. (See ergo *Alexander v. Omega Management, Inc.* (D. Minn. 1999) 67 F.Supp.2d 1052.)

28  The courts that have examined the volume or regularity of debt collection activity in the business of

1    an alleged debt collector examine the overall proportion of activities devoted to collecting *past due*

2    accounts. (See ergo *Argentieri v. Fisher Landscapes, Inc.*  (D. Mass. 1998) 27 F. Supp. 2d 84.)

3    Here, Willmark Communities performs *all* management functions for Alpine Creekside, and the

4    amount of effort devoted to collecting past due accounts versus property management and leasing

5    activities is de minimus.  (See Peel Decl. at ¶3.)

6    **B.    Defendants Attemped to Collect a Debt They Originated under 15 U.S.C. § 1692a(6)(F)**

7            To reiterate, both Alpine Creekside dba Creekside Meadows and Willmark Communities,

8    the management agent, utilized the business name all parties had acknowledged throughout their

9    relationship, and any debt was originated by the parties in the course of their relationship through

10    the Lease, and no debt was not in default prior it acquisition, or at any point in time. "[T]he FDCPA

11    does not apply to collection efforts by those who obtained the right to payment on the debt before

12    the debt was in default." (*Francheschi v. Mautner-Glick Corp.* (S.D. N.Y. 1998) 22 F.Supp.2d 250,

13    253.) In *Francheschi*, both the landlord and management agent were held not to be "debt collectors."

14    The court focused on whether there was any attempt to deceive "the least sophisticated consumer"

15    via the use of the agent's name in collection correspondence.  Likewise, there was no effort to

16    deceive Mrs. Leasure into understanding that an unrelated third party was attempting to collect her

17    debt.  There was no misunderstanding concerning the fact that a landlord was attempting to collect

18    a debt it owned and this common commercial practice is intended to avoid confusion, not create it.

19    15 U.S.C.A. § 1692a(6)(F)(ii) expressly excludes any person collecting or attempting to collect any

20    debt owed or due or asserted to be owed or due another to the extent such activity concerns a debt

21    originated by such person or persons.  That is the situation here.

22            When liability is viewed to each individual respectively, neither the owner, to which all rental

23    payments were due, and the management agent, which managed the property and serviced the

24    accounts of former tenants, can be liable under the FDCPA.  Alpine Creekside dba Creekside

25    Meadows is a creditor that directly received rental payment due it, but did not seek collection

26    directly, relying on the services of it affiliated management entity to issue account statements for

27    mailing to tenants utilizing the name of the creditor, which is permitted under FDCPA, and

28

1  specifically authorized under California State statutes.[1]  (See *Kegley v. Miles Management*

2  *Corporation* (N.D. Ill. 1992) 1992 WL 370251; see also Civ. Code 1788.13(a).)  Moreover, no debt

3  was in default when obtained, but instead originated by and between the parties. Any way the factual

4  predicates in this case are examined, there is no possible liability against either defendant.

5       Under any reasonable interpretation of the federal definition of "debt collector," multiple

6  exemptions apply.  Initially, as pointed out above, Alpine Creekside dba Creekside Meadows is a

7  creditor, and creditors are not debt collectors for the purposes of the FDCPA, and are not subject to

8  the FDCPA when collecting their accounts.  (See ergo *Stafford v. Cross* (W.D. Ky. 2003) 262

9  F.Supp.2d 776; see also *Downs v. Clayton Homes, Inc.* (6th Cir. 2004) 88 Fed.Appx. 851.)  It

10  Secondly, the owner and agent in these circumstances are also not liable in that Willmark

11  Communities is exempted from the definition of "debt collector." (See *Berndt v. Fairfield Resorts,*

12  *Inc.*  (W.D. Wis. 2004) 339 F. Supp. 2d 1064 – Purchaser of timeshare management company

13  acquired company's subsidiary's right under timeshare management agreement to collect assessments

14  on behalf of timeshare owners' association, and thus collection activity was incidental to bona fide

15  fiduciary obligation under agreement, exempting purchaser from debt collector status under FDCPA,

16  where agreement designated subsidiary as association's agent, and purchaser obtained right to collect

17  owners' debt at time when that debt was not in default.)  This exemption under 15 U.S.C. §

18  1692a(6)(F) applies to prevent liability under the FDCPA as to Willmark Communities.

19  **C.**     **Willmark Communities is Entitled to Use the "Creekside Meadows" Business Name**

20       A creditor does not fall within the "used a name other than its own" exception unless

21  the creditor actually pretends to be someone else or uses a pseudonym or alias "**which would**

22  **indicate that a third person is collecting or attempting to collect**" the debt.  Thus, the underlying

23  policy is to prevent a creditor, or an entity fitting within the exemption under 15 U.S.C. §

24  1692(6)(B), from misrepresenting who they are, not from using their legitimate business name – the

25  name with which the tenants in this case used to refer to their landlord throughout their tenancy. The

26

27  [1]Even if the actions of the management entity could be found a violation, creditors are not vicariously liable under the FDCPA for a debt collector's misconduct. (*Havens Tobias*

28  *v. Eagle* (S.D. OH 2001) 127 F.Supp.2d 889, 898.)

1    policy is to prohibit misconduct, not general business practice that pose no undue burden on the least

2    sophisticated "consumer." Here that is not the case.

3         For instance, in *Kegley v. Miles Management Corporation* (N.D. Ill. 1992) 1992 WL 370251,

4    the tenant/plaintiff vacated the apartment due to alleged failure on the part of the landlord to correct

5    defects and purported violations of the Chicago Building Code. (*Kegley v. Miles Management*

6    *Corporation* (N.D. Ill. 1992) 1992 WL 370251, *1.) The management entity then began send billing

7    statements and indicated that payment should be remitted to "Miles Management Corp. Agent for:

8    3400 Lake Shore Drive." (*Id.*) When the tenant/plaintiff filed suit under the FDCPA, he alleged that

9    the management entity was a debt collector and had wrongfully communicated with plaintiffs when

10   it knew that plaintiffs were represented by an attorney and because it identified itself on lease

11   documents, invoices for rent and otherwise as an "Agent for 3400 Lake Shore Drive" and thus is

12   using a name other than its own. (*Id.* at 2.)

13        The court found in its ruling that "Miles is a real estate property management company, and

14   the management of commercial and residential properties—not the collection of debts—is in fact

15   the principal purpose of its business. Thus, we find that Miles is collecting a debt of its own [as

16   lessor] and is not using an assumed name in its collection efforts." (*Id.* at 2.) The court went on to

17   explain that the exemption under 15 U.S.C. § 1692(6)(B) was clearly applicable:

18            Moreover, even if the conduct of Miles is construed to be collecting the debt
             of another, 3400 Lake Shore Drive, it is exempt from the requirements of the
19           statute under subsection (6)(B) because the ownership of Miles, and the
             general partner of the partnership which is the owner of the beneficial interest
20           of the trust which owns the real estate at 3400 Lake Shore Drive, are owned by
             common owners. Thus, even if the conduct of Miles were to be viewed as
21           collecting a debt for 3400 Lake Shore Drive, Miles is exempt from the statute
             because of the language of 15 U.S.C. § 1692(6)(B).
22
             (*Id.* at 3.)
23
          Thus, the exemption has been interpreted to reject claims that creditors were, or might be,
24
     "debt collectors" within the meaning of the FDCPA for having used a name other than their own that
25
     would indicate that a third person was collecting or attempting to collect their debts in the context
26
     of entities bound by common ownership and corporate control. Moreover, creditors are simply not
27
     required to collect their own debts using only their name of incorporation, but that they may collect
28

1    their debts under other names as long as they have consistently dealt with their debtors under such

2    other name, so as not to mislead their debtors as to whom is attempting to collect such debts. (See

3    ergo *Dickenson v. Townside T.V. & Appliance, Inc.* (S.D. W.Va. 1990) 770 F.Supp. 1122.) That

4    again is what happened here.  The court in *Dickenson* noted that if this were the case, then most of

5    the business entities in this country would violate the FDCPA every time they reminded a customer

6    that a payment was due. (*Id.* at p. 1131.)

7         Under the statute and case law, to be liable, a creditor or its agent must use a name indicating

8    that an unrelated entity was attempting to collect the creditor's debt. The court said in *Friedman v.*

9    *Rubinstein* (N.D. Ill. 1997) 1997 WL 757875 that the FDCPA does not impose a blanket prohibition

10   on creditors which precludes them from using another name to collect a debt; if this were true, the

11   exclusion in 15 U.S.C. § 1692a(6)(B) for related entities would be meaningless because any creditor

12   who used a related entity to collect a debt would be automatically liable. (*Taylor v. Rollins, Inc.*

13   (N.D. Ill. 1998) 1998 WL 164890.)

14        The Ninth Circuit has interpreted another exemption from the definition of "debt collector"

15   using the same logical reasoning in *De Dios v. International Realty & Investments,* (9th Cir. 2011)

16   641 F.3d 1071.  The residential property manager in that case had sent a letter to tenants attempted

17   collect accrued rent due.  It was held not to be a "debt collector," and thus the collection letter was

18   not subject to FDCPA's disclosure requirements. Interpreting 15 U.S.C. § 1692a(6)(F)(iii), the court

19   held that the exemption applied where the manager was retained to collect rent before it was

20   considered to be in default. (*De Dios v. International Realty & Investments,* (9th Cir. 2011) 641

21   F.3d 1071, 1072.) Although the Act does not define "in default," courts interpreting §

22   1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue. The

23   dictionary definition of "default" used where written agreement left it to creditor's discretion whether

24   to declare default. (*Magee v. AllianceOne, Ltd.* (S.D. Ind. 2007) 487 F.Supp.2d 1024, 1027–1028.)

25        Here, Willmark Communities was likewise provided with authority to collect rent and

26   expenses when they were not yet in default on behalf of Alpine Creekside, Inc. dba Creekside

27   Meadows, and its use of the moniker "Creekside Meadows." The lease identified the full corporate

28

names of the owner and its agent and all cover letters for the account states expressly stated that the debt remained owned by the originator.

**D.  Willmark Communities Fits within the Exception under 15 U.S.C.  1692a(6)(B) because at all times Acted for Another Entity, both of which were related by Common Ownership or Affiliated by Corporate Control**

Although Willmark Communities is not a "debt collector" for purposes of the FDCPA, *in arguendo*, if the court were to hold otherwise, then this case clearly involves a situation for which the exception under 15 U.S.C. § 1692(a)(6)(B) was intended.  Courts have held that an alleged debt collector was, or could be, excluded from the definition as an affiliate of a creditor within the meaning of the Fair Debt Collection Practices Act (15 U.S.C.A. § 1692a(6)(B)).  (See ergo *Aubert v. American General Finance, Inc.* (7th Cir. 1998) 137 F.3d 976 – Pursuant to exception for debt collection efforts of corporate affiliates, corporation whose principal business was not debt collection and which only collected debts for affiliated or related entities was not a "debt collector" for purposes of FDCPA; see also *Jarzyna v. Home Properties, L.P.* (E.D.Pa.2011) 763 F.Supp.2d 742 – Landlord was a debt collector subject to the Fair Debt Collection Practices Act's (FDCPA) corporate affiliate exemption, where it sought to collect tenant's alleged debt on behalf of its corporate owner.

In *Pavone v. Citicorp Credit Services, Inc.* (S.D.Cal.1997) 60 F.Supp.2d 1040, affirmed 172 F.3d 876, a corporate affiliate of creditor fell within in-house exemption to FDCPA.  The affiliate did not collect debts for unaffiliated entities and affiliate's principal business was not collection of debts.  Debt collection accounted for less than one quarter of the affiliate's expenses.  The plain language of the statute sets out the exception for entities that perform debt collection solely for corporate affiliates.   Here, Willmark Communities entire collection activities related to former tenants' accounts for a mere 1.5% of expense, and only one employee who spends two (2) days a week on the task of issuing account statements.  (Peel Decl. at ¶ 3.)  Fundamentally, Willmark Communities's principal purpose is not debt collection and it only performs property management services for entities related by common ownership and corporate control. (Schmidt Decl. at ¶¶ 2-4.) This case involves a clear application of the corporate affiliate exemption.

1    Plaintiffs have no admissible evidence that creates a triable issue of fact as to the First Claim

2    for Relief and therefore the claim is properly subject to summary judgment.  If the entire action is

3    not dismissed for the reasons set forth herein, the court may decline to exercise supplemental

4    jurisdiction over the pendent state law claim if the support First Claim for Relief is dismissed

5    pursuant to 28 U.S.C. § 1367(c)(3).

6                                                             **V.**

7         **THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT IN**

8    **RELATION TO PLAINTIFFS' SECOND CLAIM FOR RELIEF UNDER THE R-FDCPA**

9         As addressed above, property management companies that are authorized to collect rents and

10   related itemized charges on behalf of landlords are not liable under the Federal FDCPA when an

11   appropriate exemption applies under 15 U.S.C. § 1692a(6)(A)-(F).  (See *Reynolds v. Gables*

12   *Residential Services, Inc.,* supra, 428 F.Supp.2d at 1264; *Franceschi v. Mautner-Glick Corp.,* supra,

13   22 F.Supp.2d at 253-255.)  For instance, the FDCPA does not apply to a residential property

14   manager collecting accrued rent due where the debt was acquired before it was in default. (*De Dios*

15   *v. Int'l Realty & Investments*, supra,  641 F.3d 1071, applying 15 U.S.C. § 1692a(6)(F)(iii).)

16   Although the R-FDCPA does not require that a defendant be attempting to collect debts owed to

17   third party in order to qualify as "debt collector," the R-FDCPA clearly focuses on very specific

18   harassing or unfair conduct.  It incorporates the provisions of 15 U.S.C. §§ 1692b thru 1692j of the

19   FDCPA, although it expressly excludes compliance with 15 U.S.C. § 1692(e)(11) [dealing with

20   disclosure in written communications that the communication is for the purpose of debt collection

21   and all information will be used for that purpose, and the failure to disclosure that the

22   communication is from a debtor collector] and 15 U.S.C. § 1692(g) [dealing with validation of debts]

23   for those persons qualifying under the exemptions of 15 U.S.C. §§ 1692a(6)(A) and (B).  (Civ. C.

24   § 1788.17.)  Effectively this means that, if these exemptions apply, the issues to be determined in

25   any analysis of the claim under the R-FDCPA are narrowed to specific proscribed conduct.

26        No "unfair practices" under 15 U.S.C. 1692f have occurred in this case.  Indeed, all that has

27   occurred were the forward of account statements as expressly permitted even when a debt collector

28

1    knows the "consumer" is represented or where such communications are responses in the ordinary

2    course of business to an inquiry from the debtor. (Civil Code § 1788.14(c).) In any event, this

3    amounts to truthful, non-abusive conduct under both statutes. (See *Masuda v. Thomas Richards &*

4    *Co.* (C.D. Cal. 1991) 759 F.Supp. 1456, 1465; see also *Marcotte v. General Electric Capital*

5    *Services, Inc.* (S.D. Cal. 2010) 709 F.Supp.2d 994 – the R-FDCPA provision incorporating by

6    reference the FDCPA provision that did not include an exception for debt collectors acting on their

7    own behalf to send billing statements would not be construed to preclude sending billing statements

8    to debtor in the ordinary course of business.)

9        As addressed above, the mailing of account statements or communications made in the

10    ordinary course of business in response to the debtor's inquiry are expressly permitted. (Civ. Code

11    § 1788.14(c).)  The revised account statement was created and sent to the Leasures pursuant to the

12    direct inquiry of Mr. Leasure. (See ergo *Marcotte, supra,* 709 F.Supp.2d 994.)  Under Civil Code

13    § 1788.12, the R-FDCPA generally subjects debt collectors to the limitations on written

14    communication applied under the Federal FDCPA. (15 U.S.C. § 1692b, 1692c, 1692e(11), and

15    1692f(7),(8).)  Once again, this is to protect consumers from false, misleading, embarrassing,

16    deceptive or harassing conduct.  In this case, Defendants submit that debt evidenced by the revised

17    account statement, as audited, was and remains a valid debt, and no harassing or deceptive conduct

18    occurred.  (Ruiz Decl. at ¶ 10 and Exhibit "A.")  The purpose of the R-FDCPA is to prohibit debt

19    collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts,

20    and to require debtors to act fairly in entering into and **honoring** such debts. (See ergo *Keen v.*

21    *American Home Mortg. Servicing, Inc.* (E.D.Cal.2009) 664 F.Supp.2d 1086.)  That purpose is not

22    promoted in the context of this action.  Defendants therefore move for summary judgment on the

23    ground that there are no genuine issues of materials facts and it is entitled to summary judgment.

24    ///

25    ///

26    ///

27    ///

28

---

# VI.

## DEFENDANTS DID NOT SEEK TO COLLECT
## ANY DEBTS OWED BY GEORGE LEASURE

At no point in time did either defendant attempt to collect a debt from George Leasure. (See Ruiz Decl. at ¶ 11.) Rather, each cover letter accompanying the account statements was addressed to Amy Leasure as head of household, lessee and responsible party. (Smith Decl. at ¶ 6.)  Because any collections efforts were solely directed at Amy Leasure, George Leasure lacks standing to pursue a cause of action under the FDCPA or the R-FDCPA.  (See *Burdett v. Harrah's Kansis Casino Corp., et al.* (D. Kan. 2003) 294 F.Supp.2d 1215, 1227; see also *Sanchez v. Client Services, Inc.* (N.D. Cal. 2007) 520 F.Supp.2d 1149, 1155 at fn. 3.) Accordingly, Defendants respectfully request that George Leasure's claims under the FDCPA and R-FDCPA be dismissed and that summary judgment be entered thereon if the claims are not otherwise dismissed on the basis of the foregoing.

# VII.

## THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT IN
## RELATION TO PLAINTIFFS' THIRD CLAIM FOR RELIEF FOR FRAUD

Tortious fraud or deceit occurs when a party "willfully deceives another with the intent to induce him to alter his position to his injury or risk." (Cal. Civ. C. §1709.) The elements of fraud are a misrepresentation of a material fact with knowledge of the falsity and intent to induce reliance, with justifiable reliance and causation and damages.  Here, the only allegations dealing with the fraud claim concern the wait list maintained on premises by staff for the convenience of current residents desiring to switch apartments within Creekside Meadows. (See Complaint at ¶¶ 7-10; see also Smith Decl. at ¶¶ 2-8.) This was also confirmed in written discovery when Mr. Leasure was asked to state facts supporting the fraud claim.[2] His response there was to simply to refer to previous answers dealing with the issue of the wait list. (See Teague Decl. at Exhibit "F," Interrog. No. 34.)

///

---

[2] Mr. Leasure also confirmed in written discovery that plaintiffs spoke with a "Kaitlyn" concerning the issue of the wait list, which Ms. Smith confirms. Ms. Smith signed that Residential Lease Agreement upon behalf of defendants.

1    Fundamentally the Complaint incorrectly states that Mrs. Leasure was informed of and place

2  on a wait list from the inception of the tenancy.  This is not accurate.  It was only after Mrs. Leasure

3  complained about noisy neighbors that the issue of the wait list was discussed with Ms. Smith.  (See

4  Smith Decl. at ¶ 5.)  Plaintiffs knowingly chose to move into an upstairs apartment because no

5  downstairs units were available and only later sought to switch apartments.  Although they may have

6  chosen to move from their apartment partly as a result that no suitable downstairs apartment had

7  been available to them despite the wait list, they simply did not rely on the  fact that a wait list

8  existed in deciding whether or not to move into their apartment.  (Peel Dec. at Exhibit "F.")

9  **A.     Misrepresentation**

10    For there to be a misrepresentation a defendant must have made a representation consisting

11  of either: (1) An affirmative misrepresentation - the suggestion, as a fact, of that which is not true

12  by one who does not believe it to be true; (2) A concealment or half truth - the suppression of a fact,

13  by one who is bound to disclose it or who gives information of other facts which are likely to

14  mislead for want of communication of that fact; or (3) A false promise - a promise made without any

15  intention of performing it. (Cal. Civ. C. § 17101.)

16    Here, no misrepresentation was made because a wait list did in fact exist and was maintained

17  on premises by staff.  Any representations concerning the wait list were true and the Plaintiffs were

18  in fact placed on the wait list at the time of their request.  Moreover,  although substantial revisions

19  have been made to the account statements because of the renewal notice that was issue in error, these

20  were innocent errors that were immediately acted upon when addressed by Mr. Leasure.  (See Ruiz

21  Decl. at ¶¶ 5-10; see also Peel Decl. at Exhibit "J.")

22  **B.     Material Fact**

23    Any misrepresentation must be of a material fact, essential to the analysis undertaken by the

24  plaintiff and such that the plaintiff would not have acted as he did without it. (*Roddenberry v.*

25  *Roddenberry* (1996) 44 Cal.App.4th 634, 665.)  The fact represented or suppressed is deemed

26  material if it relates to a matter of substance and directly affects the purpose for which the deceived

27  party acted. (*Handley v. Handley* (1960) 179 Cal.App.2d 742, 746.)  A plaintiff will be unable to

28

1    show materiality or causation if he could have done nothing to improve his position had he known

2    initially that the representation was false. (*Bezaire v. Fidelity and Deposit Co.* (1970) 12 Cal. App.

3    3d 888, 893.) Here, the plaintiffs willingly and knowingly executed the lease and moved into an

4    upstairs apartment without requesting to be placed on the wait list.  Whatever their preference might

5    have been, the existence of a wait list was not a term of the lease or a condition of its execution.

6    **C.        Knowledge of Falsity**

7            The misrepresentation must be made with a knowledge of its falsity or a knowledge of the

8    effect of concealment of a material fact. (*Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 227;

9    *Block v. Tobin* (1975) 45 Cal.App.3d 214, 219.) To support a finding of intentional deceit, the

10   misrepresentation must have been made with the knowledge it is or may be untrue. (*Seeger v. Odell*

11   (1941) 18 Cal.2d 409, 414.)  There is no statement or representation that plaintiffs have made at

12   issue that was made with knowledge of its falsity.  Rather, a wait list existed and the Plaintiffs,

13   subsequent to execution of the lease agreement, were placed on it when they asked. No

14   representation was ever made as to how long they would be on the wait list.

15   **D.        Intent to Induce Reliance**

16           The defendant must intend to induce the plaintiff to alter his or her position to his or her

17   injury or risk. (Cal. Civ. C. §1710.) If a defendant made a misrepresentation but had no intent to

18   induce the plaintiff's reliance on the statement, there is no deceit proven, despite plaintiff's reliance

19   to his detriment. The defendant is not liable for intentional deceit for unintended consequences.

20   (*Conrad v. Bank of America* (1996) 45 Cal. App. 4th 133, 157.) This element is also a non sequitur

21   given that a wait list was in fact maintained by staff for current tenants and no representation was

22   made as how long they would be on the wait list.

23   **E.        Justifiable Reliance**

24           A party seeking relief from intentional deceit must prove that he actually relied on the

25   misrepresentation. Actual reliance occurs when a misrepresentation is an immediate cause of

26   plaintiff's conduct and which, absent such representation, he would not have engaged in the activity

27   in all probability. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976-77.) In

28

1   considering such burden, the allegations set forth in the complaint and in written discovery clearly

2   brake down.  Not only was there a wait list and intent to utilize it for the benefit of tenants, but

3   Plaintiffs, by virtue of admittedly entering into the Lease, do not dispute that they executed a lease

4   for an upstairs apartment with no guarantee of ever having a suitable downstairs apartment available

5   to them. Additionally no representation was made as to how long they would be on the wait list.

6   Obviously, no reliance was placed on the initial account statement because they contested that any

7   amount was due based upon the contention that the Lease had been "released." (Ruiz Decl. at ¶ 5.)

8   There are therefore no factual issues of reliance.

9   **F.      Causation and Damage**

10      Reliance on the misrepresentation must cause plaintiff damage; misrepresentations without

11   damage do not support a cause of action for deceit.  (*Nagy v. Nagy* (1989) 210 Cal. App. 3d 1262,

12   1268; *Wildey v. Seaver* (1931) 111 Cal.App. 565, 568.)   The misrepresentation must be the

13   proximate cause of the damage. (*GN Mortgage Corp. v. Fidelity Nat'l Title Ins. Co.* (1994) 21 Cal.

14   App.4th 1802, 1807-08.) The standard of proof requires that the party claiming fraud must prove

15   the elements of the claim.  (*Doctor v. Lakeridge Constr. Co.* (1967) 252 Cal. App. 2d 715, 718.)

16      Any issue of the wait list did not cause any damages because no damages alleged in the

17   complaint are attributable to any representation of any defendant.  Neither the issue of the wait list,

18   which arose subsequent to execution of the lease and did not involve any untrue statements, nor the

19   account statements, which were not relied upon for any purpose, led to any damages.  Accordingly,

20   summary adjudication of this claim for relief is appropriate as there is no genuine issue as to any

21   material fact and the Defendants are entitle to relief.

22                                          **VIII.**

23            **THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT**

24            **IN RELATION TO PLAINTIFFS' FOURTH CLAIM FOR RELIEF FOR**

25                  **BAD-FAITH RETENTION OF SECURITY DEPOSIT**

26      California Civil Code § 1950.5 is the statute directing disposition of a security deposit upon

27   the vacating of leased residential premises in California.  A true and correct copy of the statute is

28

1  included in the Notice of Lodgment in Support of Defendants' Motion for Summary Judgment or,

2  in the alternative, Summary Adjudication as Exhibit "11."  According to Section 1950.5(b), the

3  definition and purpose of a security deposit is as follows:

> (b)  As used in this section, "security" means any payment, fee, deposit or charge, including, but not limited to, any payment, fee, deposit, or charge, except as provided in Section 1950.6, that is imposed at the beginning of the tenancy to be used to reimburse the landlord for costs associated with processing a new tenant or that is imposed as an advance payment of rent, **used or to be used for any purpose**, including, **but not limited to**, any of the following:
> (1)  **The compensation of a landlord for a tenant's default in the payment of rent**.
> (2)  **The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant**. . . .

(Civ. C. § 1950.5(b) [Emphasis added].)

The Residential Lease Agreement provided for payment of a security deposit in the amount of ninety-nine dollars ($99.00) in Section 7.  It went on to describe the circumstances under which the security deposit could be deducted against an outstanding balance upon move-out. This was set forth in Section 7(b) of the Agreement as follows:

> b. Should Lessee comply with all the terms, convenants, and conditions of the Lease to be performed by said Lessee and promptly pay all of the rent provided for herein and all other sums payable by Lessee to Lessor hereunder, the said security deposit shall be returned to Lessee upon termination of the Lease. . . .UPON TERMINATION OF TENANCY, LESSOR MAY CLAIM OF SUCH SECURITY DEPOSIT SUCH AMOUNTS NECESSARY TO REMEDY DEFAULTS WITH RESPECT TO PAYMENT OF RENT, REPAIR OF DAMAGE (INCLUDING PAINT DAMAGE) TO EITHER THE APARTMENT, PERSONAL PROPERTY OF LESSOR IF ANY, OR COMMON AREAS OF THE APARTMENT COMMUNITY CAUSED BY THE LESSEE OR HIS/HER GUEST, AND TO CLEAN THE APARTMENT (INCLUDING ALL JANITORIAL, WINDOWS, WINDOW COVERINGS, AND FLOOR COVERINGS) UPON TERMINATIONS. Said security deposit shall not constitute a measure of Lessor's damages in the event of a default. ...[3]

---

[3]Plaintiffs have argued in discovery that the entirety of the Lease is a contract of adhesion. However, describing a contract as one of adhesion does not affect its enforceability. (*Fittante v. Palm Springs Motors, Inc.* (2003) 105 Cal. App. 4th 708.) Rather, it results only in construing ambiguous terms against the preparer of the contract. (*United Multiple Listing Service, Inc. v. Bernstein* (1982) 134 Cal. App. 3d 486.) Plaintiffs have pointed to no such terms in the Lease where they claim the doctrine may apply.

1    The security deposit was applied in accordance with the contract and applicable law. (See

2  Ruiz Decl. at ¶¶ 8-10.) Even after the reductions and credits made to the account statement because

3  of what are admittedly internal errors concerning how certain lease terms were input into Willmark

4  Communities, Inc. new computer program, it was still within it's rights to apply the deposit to the

5  final account, a permissible practice under California law.

6  **A.     Requirements under Civil Code § 1950.5 for Retention of a Security Deposit**

7    A security deposit is any sum received by the landlord other than for current rent regardless

8  of the name or title placed on the funds and regardless of the purpose of the payment. The advance

9  payment includes any payment, fee, deposit, or charge; however it may be labeled to be used as

10  compensation for the tenant's nonpayment of rent, the repair injury to the premises caused by the

11  tenant or his or her guest or licensee (exclusive of ordinary wear and tear), the cleaning of the

12  premises on termination of the tenancy, or to remedy other defaults by the tenant, including future

13  defaults by the tenant of any of the obligations under the rental agreement to repair or replace, or

14  return personal property or appurtenances when authorized by the agreement. (Civ. C. § 1950.5(b).)

15  Fees or charges for "administrative fees," consideration for execution of the lease, or other types of

16  fees or charges for any purpose other than the payment of rent as consideration for the use and

17  occupancy of the premises (except for application screening fees), are subject to the landlord's

18  obligation to refund to the tenant, less permissible deductions. (Civ. C. § 1950.5.)

19    The deposits are subject to refund to the tenant at the termination of the tenancy, after lawful

20  deductions. (*Id.*) The rental agreement may expressly provide the purposes for the deposit. When

21  the deposit is security for the tenant's payment of rent, for the cleaning of the premises, or for the

22  repair of damages caused by the tenant, the cost of these items may be deducted by the landlord from

23  the deposit. (Cal. Civ. C. § 1950.5(e).) The landlord may deduct an amount which is reasonably

24  necessary to remedy the tenant's defaults as to those items identified. (*Id.*) The landlord must

25  deliver, by personal service or first-class mail postage prepaid a written itemized statement of the

26  amount of the deposit, its disposition, and the balance due the tenant. (Cal. Civ. C. § 1950.5(f and

27

28

1   (g)).)[4]  If any balance is due, it must also be paid to the tenant within the same three-week period.

2   **B.   Defendants were Entitled to Apply the Security Deposit**

3   Willmark Communities was required to provide Mrs. Leasure, by personal delivery or
4   postage prepaid first-class mail, with a copy of an itemized statement indicating the basis for and
5   amount of any security received and the disposition of that security (i.e., showing what amounts are
6   being retained and for what reasons) and return to the tenant "any remaining portion of the security"
7   (i.e., amounts that cannot lawfully be retained).  It did just that, albeit with the caveat that credits
8   were given Mrs. Leasure because of internal technical issues which led to the incorrect renewal
9   letter.  With only a $99.00 security deposit, even after the credits that were made after Mr. Leasure
10  expressed concern about accelerated rent and the concession chargeback line items – which were
11  withdrawn – and a full audit performed in the course of this litigation, a balance pursuant to the
12  terms of the Lease was due and owing in excess of the security deposit.  (Civ. C. § 1950.5(g).)
13  Defendant Willmark Communities complied with the statute.  Accordingly, summary adjudication
14  of this claim for relief is appropriate as there is no genuine issue as to any material fact.[5]

15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23

24  _____

25      [4]The statute requires issuance of the final account and return of any balance of a
    security deposit within twenty-one (21) day of move-out, although if the final day of the
26  notice period falls on a holiday, or a Saturday or Sunday, the notice period expires at the end
    of the next day that is not a holiday, Saturday or Sunday. (See CCP §§ 12, 12a & 12b.)

27      [5]Technical non-compliance with Civ. C. § 1950.5 does not void a landlord's right to
    setoff despite any failure to comply with the statute in good faith. (*Granberry v. Islay Inv.*
28  (1995) 9 Cal.4th 738.)

## IX.

## CONCLUSION

Since Defendants cannot be construed to be a debt collector under any meaning of the FDCPA, plaintiff's First Cause of Action must be dismissed as to both Defendants. Summary adjudication is appropriate as well for each of the state law claims for relief as there are no genuine disputes as to any material facts. There are no violations of the R-FDCPA and Plaintiffs cannot prove necessary elements of the fraud and bad faith retention of security deposit claims for relief.

Dated: June 20, 2012                                     SMAHA LAW GROUP


                                                         /s/ John L. Smaha
                                                         John L. Smaha, Esq.
                                                         John Paul Teague, Esq.,
                                                         Attorneys    for    Defendants    Willmark
                                                         Communities, Inc. and Alpine Creekside, Inc.

W:\SCHMIDT\Alpine Creekside\Leasure v. WM Communities, et al\MSJ\MSJ 07.23.12\110.MSJ Ps and As.wpd